IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 4, 2019 Session

## IN RE  KELSEA L.

**Appeal from the Chancery Court for Hawkins County**
**No. 2018-AD-28     Thomas J. Wright, Judge**

_____

**No. E2019-00762-COA-R3-PT**
_____

This appeal involves the termination of a father's parental rights based on the ground of abandonment by willful failure to visit and willful failure to support.  The father appeals. We reverse the trial court's finding of willful failure to support but affirm the trial court's finding of willful failure to visit and its determination that termination of parental rights is in the best interest of the child.  Accordingly, we affirm termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part and Affirmed in Part**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Samuel E. White, Kingsport, Tennessee, for the appellant, Timothy L.

Daniel G. Boyd, Rogersville, Tennessee, for the appellees, Scott H. and Latosha H.

**OPINION**

### I.    FACTS & PROCEDURAL HISTORY

Timothy L. ("Father") and Latosha H. ("Mother") are the biological parents of one child, Kelsea, who was born in 2003.[1]  Father and Mother divorced in 2009, and Mother remarried later that year.  Kelsea then resided primarily with Mother and her husband ("Stepfather").

Father maintained some visitation and consistently paid child support until he was

_____

[1] In this parental termination case involving a minor child, all participants will be identified in a manner that protects the privacy of the minor.

injured in a work-related accident and lost his job in 2015. Around that time, Father and Mother became involved in post-divorce disputes and litigation regarding Father's alleged failure to pay child support and Mother's alleged interference with his visitation rights. Father and Mother mutually agreed to dismiss their petitions. Father admittedly became frustrated with the situation and ceased all contact with Mother and Kelsea around 2016.

On June 26, 2018, Stepfather and Mother filed a petition for termination of Father's parental rights and adoption by Stepfather. Father opposed the petition and was appointed counsel. By the time of trial, Kelsea was fifteen years old. The trial court heard testimony from Father, Mother, Stepfather, and Kelsea. The court found by clear and convincing evidence that Father had abandoned Kelsea by willfully failing to visit or support her within the four-month period prior to the filing of the petition. The court also found that termination of Father's parental rights was in Kelsea's best interest. As such, the trial court terminated Father's parental rights. Father appeals.

## II. ISSUES PRESENTED

Father presents the following issues, which we quote from his brief on appeal:

1.      Did Appellant abandon the minor child during the four months preceding the filing of the Petition to Terminate Parental Rights when there was a history of litigation by Appellant seeking visitation prior to the four months preceding the filing of the petition?

2.      Did the Court correctly find that termination of parental rights is in the minor child's best interests when the Appellant did have a history of actively attempting to seek visitation through litigation prior to the four months preceding the filing of the petition?

Although Father does not challenge the trial court's ruling that he willfully failed to support Kelsea, we must review the trial court's finding as to that ground as well. *See In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal").

## III. STANDARDS APPLICABLE TO TERMINATION CASES

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). According to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must

prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.*

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination must prove both of the required elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate any serious or substantial doubt about the correctness of the findings. *In re Bernard T.*, 319 S.W.3d at 596.

Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination

The first ground for termination listed in Tennessee Code Annotated section 36-1-113(g) is abandonment by the parent. Thus, one ground for terminating parental rights exists if "abandonment" occurs within the meaning of the statute. Tenn. Code Ann. § 36-1-113(g)(1). The statutory scheme provides several alternative definitions of abandonment in Tennessee Code Annotated section 36-1-102(1). For purposes of this appeal, the relevant definition provides that "abandonment" occurs when:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of

the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017).[2] Pursuant to this definition, the burden of proof was on the petitioner to show that the parent's failure to visit or failure to support during the relevant period was willful. *In re Alexis S.*, No. E2018-01989-COA-R3-PT, 2019 WL 5586820, at *3-4 (Tenn. Ct. App. Oct. 29, 2019). "A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013).

The petition in this case was filed on June 26, 2018. Accordingly, the relevant four-month timeframe spans from February 26 to June 25, 2018. *See In re Jacob C. H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining how to properly calculate the four-month period).

### 1. Willful Failure to Visit

We first consider whether Father abandoned Kelsea by willful failure to visit. Father had no contact with Kelsea during the four month period. By his own admission, his last visit with Kelsea occurred years before the petition was filed. The parties divorced in 2009, when Kelsea was almost five years old. Father filed three petitions for contempt against Mother thereafter, alleging that she was not allowing him visitation. Two were filed with the assistance of counsel, and one was filed by Father pro se. According to Father, one contempt action was resolved by Mother agreeing to cooperate with visitation; another was resolved by mediation; and he voluntarily dismissed the third because Mother filed a counter-petition for contempt against him for nonpayment of child support. Father admittedly owed over $3,000 in child support and dismissed his petition "to keep from going to jail."

After the last petition was dismissed around January 2016, Father became frustrated with the "justice system" and ended his pursuit of litigation. He had no more visits or contact with Kelsea. When asked at trial why he made no attempts to contact Kelsea during the relevant four-month period, he responded:

> What's the purpose? Each time I try and each -- I get nowhere. Going through the Court, nothing happens, so, I mean, why continue to make it traumatic on my child and keep coming into Court and keep raising the

---

[2] This statute was amended effective July 1, 2018. *See* 2018 Pub. Acts, c. 875. However, we apply the version of the statute in effect when the case was initiated. As amended, the statute no longer includes the term "willful" in its definition of abandonment. Instead, the absence of willfulness is an affirmative defense, and the parent must prove by a preponderance of the evidence that the failure to visit or support was not willful. *In re Melinda N.*, No. E2017-01738-COA-R3-PT, 2019 WL 480204, at *15 n.6 (Tenn. Ct. App. Feb. 7, 2019). *In re Alexis S.*, 2019 WL 5586820, at *3 n.4; *In re Channing M.*, No. E2019-00504-COA-R3-PT, 2019 WL 5431869, at *3 n.5 (Tenn. Ct. App. Oct. 23, 2019).

issue. I figured I would give her time to come around once she was able to possibly get her license. I mean, I understand it's a couple of years, but I felt that it would be better on her to do that than it would be to push the situation.

He admitted at trial that he had not really had a relationship with Kelsea for the last three years or so. Still, on appeal, Father asks this Court to consider the "history of litigation" to find that his failure to visit during the relevant timeframe was not willful.

A parent's failure to visit is deemed willful when it is the product of free will rather than coercion. *In re M.L.P.*, 281 S.W.3d at 392 (citing *In re Audrey S.*, 182 S.W.3d at 863). Accordingly, if a parent attempts to visit a child but is thwarted by the acts of others, the failure to visit is not willful. *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *Id.* at 393. Also, "[w]hen analyzing willfulness, courts have considered whether a parent who was allegedly denied visitation redirected their efforts to the courts in an attempt to secure visitation." *In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *5 (Tenn. Ct. App. Dec. 22, 2016).

For instance, in *In re Adoption of A.M.H.*, 215 S.W.3d at 796, our supreme court held that the parents' failure to visit was not willful when "there was animosity between the parties and [] the parents were actively pursuing custody of [the child] through legal proceedings during the four-month period[.]" On the other hand, in *In re M.L.P.*, 281 S.W.3d at 393, the supreme court found that a father's failure to visit *was* willful, even though his early attempts to visit were admittedly discouraged by the child's caregiver, when the father "did not make any attempt to contact or visit [the child] for more than one year prior to the petition to terminate his parental rights" and had no explanation for his inaction. Similarly, in *In re Adoption of Angela E.*, 402 S.W.3d at 642, the supreme court found that a father's failure to visit was willful even though he had filed a petition to reinstate his visitation rights when "he took no action to advance the petition" and "had no reasonable excuse for failing to pursue the petition to reinstate visitation" for two years.

Here, the trial court found that Father willfully failed to visit Kelsea during the relevant four-month period because he "made no efforts toward visitation" during that timeframe. The trial court found that Father had taken legal action in years past to assert his parenting rights and was familiar with the process for accessing the courts for that purpose, yet he took no action to do so at any time near the four-month period. Simply put, the trial court found that Father had "quit trying" to visit Kelsea. The record supports the trial court's conclusions with respect to this issue. This is not a case where a parent was actively pursuing visitation. When asked about his efforts, Father merely

claimed that he showed up at Kelsea's school when she was in middle school and was turned away by the principal, and at some point during the last three years he knocked on Mother's door but no one answered. Notably, however, Father testified at trial, during examination by the guardian ad litem:

> Q. [Father], during the four month window that we've really been focusing on from February of 2018 to June of 2018, would you agree that you willfully did not visit your daughter?
> A. Yes.
> Q. So of your own accord.
> A. Yes.
> Q. Okay. No one stopped you from doing that other than yourself.
> A. Sure.
> Q. Okay. Your reasoning for that is due to past actions and believing that if you tried, it wouldn't get you anywhere. Correct?
> A. Correct.

We affirm the trial court's finding of abandonment by willful failure to visit.[3]

## 2. Willful Failure to Support

Again, even though only one ground for termination must be proven, and Father does not raise any issue on appeal regarding failure to support, we must address the trial court's finding as to this ground as well. *See In re Carrington H.*, 483 S.W.3d at 511.

Father made no child support payments during the four months spanning from February 26 to June 25, 2018. However, he argued at trial that his failure to pay was not willful because he had been injured in a work-related accident, lost his job, and was actively pursuing disability benefits.

Father's child support obligation was around $380 per month. The record contains a printout of Father's child support payment history from the Tennessee Department of Human Services, which indicates that he consistently paid child support from January 1, 2010, until May 13, 2016. Mother's testimony confirmed this information. She testified that Father paid his child support obligation regularly until he abruptly stopped paying in 2016.

---

[3] Father's argument on appeal largely centers on his position that "the law should be changed" because the four-month timeframe sets an arbitrary window. However, "[t]he courts are not the proper bodies to change valid legislative enactments." *State v. Clegg*, 638 S.W.2d 434, 435 (Tenn. Crim. App. 1982). "It is not our prerogative . . . to review the wisdom, reasonableness, or desirability of a statute." *Marino v. Bd. of Admin. City of Memphis Ret. Sys.*, No. W2015-00283-COA-R9-CV, 2015 WL 7169796, at *5 (Tenn. Ct. App. Nov. 16, 2015).

Father testified that he had been doing electrical work for thirteen years and was employed by an electrician until he was electrocuted on a jobsite. Father testified that the injury left him blind in his left eye and impacted his hearing in his left ear. He testified that his eye is under enormous pressure and is in danger of bursting. According to Father, he experiences excruciating headaches and gets sick a couple of times per week. He also testified that the injury impacted his balance. He testified that his employer terminated him in November 2015 because he could no longer safely perform his duties in construction work. Father testified that he received unemployment benefits for a short period after his termination and that child support was paid from those benefits until May 2016. Father testified that he filed a worker's compensation claim and accepted a $1,000 settlement. He also applied for social security disability benefits, but his first application and request for reconsideration were denied without a hearing. At the time of trial, Father was scheduled to appear for his first hearing before an administrative law judge the following month.

Father claimed that his situation "kind of f[e]ll apart" after his injury because of his lack of income. He had not applied for any full-time jobs because of his weekly bouts with headaches and sickness, but he did "odd jobs" for neighbors like raking leaves or cleaning houses when he felt like he could work. Father testified that this income "for the most part" provided him with enough money to keep his utilities turned on but that doing so was "rough." He lived with his fiancée in a house owned by his father, and his only bills were for electricity, water, telephone, and car insurance. He did not have cable television or health insurance. He estimated that his monthly bills totaled $350 to $400 per month. He also had to pay out of pocket for doctor's visits regarding his eye and for gas to get to appointments. No evidence was presented regarding exactly how much income he received from doing "odd jobs" on any particular occasion or during any particular period. He said that when he has "a little extra [money] here and there," which is "not very much," he spends it on necessities like toilet paper and household items. Father was receiving food stamps and testified that he did not have any extra available cash to pay toward child support.

The trial court acknowledged that Father had a pending social security disability claim. However, it also noted that the social security administration had previously denied his applications for disability benefits and that he only received $1,000 from his worker's compensation settlement (before he was terminated from his job). The court noted that Father did not present any medical proof of his disability at the termination trial and therefore "inferred" that he had insufficient medical proof of his disability. As such, the court found that Father had "the capacity to work." The court acknowledged that Father was receiving food stamps but also doing "odd jobs for cash." Because Father was "able to live independently" and pay his water, electric, telephone, and car insurance expenses, the trial court found that Father willfully failed to support Kelsea during the relevant four-month time frame.

Having carefully reviewed the record, we conclude that the evidence does not clearly and convincingly establish that Father's failure to support Kelsea was willful. The evidence shows that Father has been doing odd jobs since he was injured and terminated by his employer, and he is barely able to keep his utilities turned on. More importantly, we have no evidence of his actual income during the pivotal four-month period. Although the trial court faulted Father for his failure to present medical proof regarding his injury, it was not Father's burden to prove, at the termination trial, that he was disabled or that he was unable to pay child support.

Under the definition of abandonment applicable to this case, the burden was squarely on the party seeking termination to establish by clear and convincing evidence that the parent who failed to support "had the capacity to pay, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Maddox G.*, No. W2018-01115-COA-R3-PT, 2019 WL 927062, at *5 n.5 (Tenn. Ct. App. Feb. 25, 2019). Furthermore, "'[i]n determining a parent's capacity to pay support, it is not enough for a petitioner to simply prove that [the parent] was not disabled during the relevant timeframe and therefore assume that he or she was capable of working and providing support." *In re Addalyne S.*, 556 S.W.3d 774, 788-89 (Tenn. Ct. App. 2018) (quoting *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *4 (Tenn. Ct. App. July 28, 2017)). "In the context of willful failure to support one's child, the willfulness criterion must be established, by the party seeking termination, by showing that the parent had the means and ability to provide support." *In re Dylan S.*, No. E2018-02036-COA-R3-PT, 2019 WL 5431878, at *5 (Tenn. Ct. App. Oct. 23, 2019). Proving capacity requires evidence of both income and expenses. *In re Alexis S.*, 2019 WL 5586820, at *5. "Simply finding that [the parent] worked and was compensated at some point during the four-month period does not, by itself, mean that [he or] she had the ability to pay child support." *In re Alysia S.*, 460 S.W.3d 536, 570 (Tenn. Ct. App. 2014).

The petitioners failed to present clear and convincing evidence that Father had the capacity to support the child during the relevant four-month period and had no justifiable excuse for not doing so. As such, we reverse the trial court's finding as to this ground for termination. However, this conclusion is not outcome-determinative because another ground for termination was sufficiently proven.

## B. Best Interest

When at least one ground for termination has been proven by clear and convincing evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). Courts consider nine statutory factors set forth in Tennessee Code Annotated section 36-1-113(i) when conducting the best interest analysis. *Id.* In doing so, we must bear in mind that the child's best interest must be viewed from the perspective of the

child, not the parent. *Id.* If the best interest of the child and the interest of the adults conflict, such conflict must always be resolved in favor of the child. *Id.* at 681-82.

In the trial court's best interest analysis, it found that Father had failed to maintain contact with Kelsea. It found that Father is familiar with the court system and how to access the courts but that he had not taken any action to do so in the time period surrounding the filing of the termination petition. The trial court further found that Father knew Kelsea's address but did not send her any gifts, cards, or letters. In short, the trial court found that the relationship between Father and Kelsea was "destroyed" by the three years of no contact between them. The trial court also found, based on Kelsea's in-court testimony, that "there appears to be no likelihood of the establishment of a meaningful relationship between the biological father and the child even if the father's parental rights are not terminated." The trial court found that forcing Kelsea to have a relationship with Father at this point would be detrimental to her. The court found that Kelsea and Stepfather have a close and loving relationship and that Stepfather has supported Kelsea financially and emotionally for years. At the same time, the court noted that Father had not supported her.

The evidence fully supports the trial court's findings. The statutory best interest factors that Father argues were "clearly the most relevant" under the circumstances are the same factors discussed by the trial court. Father also concedes that an analysis of these factors "do[es] point towards the child not having a meaningful relationship with [Father]." However, Father again asks this Court to consider his "failure to get meaningful results from the legal system in the past . . . as an unwritten factor." We have indeed given due consideration to Father's efforts in years past, but we also recognize his lack of effort in recent years to maintain any sort of contact with Kelsea to preserve a relationship with her. Considering all the circumstances, we conclude that the proof amounts to clear and convincing evidence that termination of parental rights is in the best interest of the child.

## V. CONCLUSION

For the aforementioned reasons, we reverse the decision of the chancery court in part, and we affirm in part, and we affirm the termination of Father's parental rights. Costs of this appeal are taxed to the appellant, Timothy L., for which execution may issue if necessary.

_____
CARMA DENNIS McGEE, JUDGE

- 9 -